I. H. GINGRICH & SONS *v.* CITY OF GRAND RAPIDS.

ASSOCIATED WAREHOUSE, INC., *v.* SAME.

1. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—ESTOPPEL.
   Where assessments for expense of street improvement were not levied in accordance with provisions of city charter or in proportion to benefits received, property owners are not estopped from contesting said assessments by the fact that they petitioned for said improvement.

As to present use of property as test of benefits, see annotation in 28 L. R. A. (N. S.) 1177; 40 L. R. A. (N. S.) 936.

2. SAME—STREET IMPROVEMENT—BENEFITS.

It is not present use of property which determines benefit it receives from street improvement, but rather its available uses.

3. SAME—INEQUITABLE ASSESSMENTS—INJUNCTION.

Collection of tax for expense of street improvement was properly enjoined, where assessments therefor were not levied in accordance with provisions of city charter, were lacking in uniformity and equality, and were far removed from plan of levy according to benefits.

Appeal from Superior Court of Grand Rapids; Verdier (Leonard D.), J. Submitted October 6, 1931. (Docket Nos. 7, 8, Calendar Nos. 35,285, 35,286.) Decided January 4, 1932.

Bills by I. H. Gingrich & Sons and Associated Warehouse, Incorporated, Michigan corporations, against the City of Grand Rapids, a municipal corporation, and another, to enjoin the collection of certain special assessments for street improvements. Cases consolidated for trial. Decrees for plaintiffs. Defendants appeal. Affirmed.

*Travis, Merrick, Johnson & McCobb,* for plaintiff I. H. Gingrich & Sons.

*Francis L. Williams,* for plaintiff Associated Warehouse, Incorporated.

*Ganson Taggart* and *Robert S. Tubbs,* for defendants.

SHARPE, J. The opinion of the trial court clearly states the facts presented by the record in these cases. We are fully in accord with the conclusion reached by him as to the rights of the parties. We therefore adopt his opinion as that of this court. It reads:

"The above-named plaintiffs each brought suit to enjoin the collection of three special assessments re-

spectively for the opening, the grading, and the paving of Cherry street for the block between Ellsworth avenue and Market avenue, the principal ground of their complaint being that the cost of the improvement has not been levied upon the several parcels affected 'in proportion as near as may be, to the advantages which each parcel shall be deemed to be benefited by the making of such improvement,' as required by the provisions of section 12 of title 10 of the charter of the city. Due to the similarity of the two cases, it was agreed by the attorneys for the respective parties that their trial be consolidated.

"Cherry street is an east and west thoroughfare commencing at Lake drive at its eastern extremity and thus connecting with the principal State highways to Lansing, Detroit, and other points east. Going westerly it crosses several main railroad tracks, gradually becoming narrower until it reaches Ellsworth avenue, where, prior to the improvement, it practically ran dead, being confronted with a hill which sloped upward from Ellsworth avenue to a height of about 30 feet and then downward to the east line of Market avenue and Finney avenue, where it ended at approximately the grade of those streets. Before the improvement, Cherry street was practically impassable for the block from Ellsworth avenue to Market avenue, on account of this bluff, over which led what was merely a narrow lane. The land in this block on both sides of the street was of about the same height and had the same general contour.

"In August, 1926, the plaintiff Associated Warehouse, Inc., purchased the land lying to the north of what is now Cherry street, running east of Market avenue for a distance of 276.65 feet and north to the south line of Oakes street (which is the first street north of Cherry). It caused the excavation of a part of the hill that has been mentioned, to the grade of Oakes street and Market avenue, and erected a build-

ing thereon facing both of said streets and served by paved driveways to both. This building was completed and occupied by the warehouse company before it had any knowledge of the proposed opening of Cherry street and that part of the hill between its building and what is now the north line of Cherry street, a distance of about 86 feet, was, until later developments, left unexcavated, as the company had no occasion for an outlet to Cherry street.

"In January, 1927, Arthur J. Gingrich purchased the land between the warehouse company's land and Ellsworth avenue with a frontage of 230 feet on what later became Cherry street, and 285 feet on Ellsworth avenue, without any knowledge of a proposed Cherry street opening.

"Some years before, the city had employed a city planning engineer, Bartholomew by name, who had submitted a plan for opening and widening certain streets for zoning, beautification, new bridges, etc. It was a part of this plan that Cherry street be widened and straightened from Division avenue west, that it be opened from Ellsworth avenue to the river, and that a bridge be constructed across the river at this point.

"The Star Transfer Company owned the premises at the northeast corner of Cherry and Ellsworth, and its property encroached upon what, according to the Bartholomew plan, should become a part of Cherry street widened. This company, early in 1927, started to erect a building on this corner. Learning of this plan, the city procured an option from the Star Transfer Company for the purchase, and later did purchase, a strip of land 25 feet wide on the north side of Cherry street and extending 110 feet east of Ellsworth avenue to permit the widening of Cherry street in accordance with the Bartholomew idea. Upon its own initiative and without the request of any property owner, the city commission then, on April 18, 1927, passed a resolution declaring the

widening and opening of Cherry street from Ionia avenue to Market avenue to be a necessary public improvement, and then caused the execution of the project, except that no widening was done east of the 110 ft. strip purchased from the Star Transfer Company.

"In the meantime the city had procured options from Arthur J. Gingrich and the warehouse company for the purchase, and later did purchase, a strip of land at the south end of their respective properties to obtain the required width for the proposed opening of Cherry street from Ellsworth avenue to Market avenue—this, upon the representation of Hugh E. Lynch, an employee of the city planning commission, that Cherry street was going to be opened and extended by a bridge across the river in accordance with the Bartholomew plan.

"As the Gingrich company was about to erect a building on this land (which, less what had been deeded to the city for street purposes, Arthur J. Gingrich had conveyed to the plaintiff company), it was not difficult to secure the signature of Gingrich, who in turn obtained one from the warehouse company, in which he was also a stockholder, to grade and pave the proposed opening, so that the company might know where and at what level it could build. The theory of the city that because plaintiffs petitioned for this improvement they are estopped from contesting the assessment is untenable. Plaintiffs' petition for the improvement asked that the expense thereof be levied in accordance with the provisions of title 10 of the city charter; and, as will be seen later, that has not been done. Plaintiffs are not claiming that they should not pay any of the expense of the improvement; they are only claiming that they are being called upon to pay more than their just share, that the real estate benefited has not been assessed in proportion to the benefits received, and from this they certainly cannot be estopped.

"Later the city commission declared the grading and paving to be necessary public improvements, contracts were let, and the improvement completed. Hearings were held for the purpose of establishing assessment districts for the several improvements and objection made by plaintiffs to the districts proposed. The districts to be assessed were finally fixed over the objection of plaintiffs, the roll spread and confirmed, appeals duly filed by plaintiffs, and denied by the commission.

"In the meantime, the plaintiff Gingrich company had, at a cost of about $15,000, excavated the hill on its premises to the grade of Cherry street, as opened between Ellsworth and Market, and had erected a building covering its full frontage of 230 feet on Cherry street, and with a frontage of 78 1/6 feet on Ellsworth avenue.

"The plaintiff warehouse company, after the grading, also excavated at a cost of about $7,500 that part of the hill south of its building to the line of Cherry street, but erected no building thereon.

"It was only by means of the removal of this hill at their own expense that either of the plaintiffs was enabled to make any use whatever of the Cherry street opening. On the south side of the street, the owners chose not to excavate, and have left their property standing on top of the hill, with the exception of the lot at the southwest corner of Ellsworth and Cherry, which was excavated by the owner, A. Van Eerden, and the 50-foot lot at the southeast corner of Cherry and Finney, which was at the down slope of hill and required practically no excavation to bring it down to the grade of the opening. The fact that the owners on the south side of the street did not excavate, made necessary the building of a retaining wall to shore up their property, and the cost of this wall was made a part of this assessment by adding it to the grading tax.

"The cost of paving was assessed against the abutting owners on each side of the street in the

block between Ellsworth and Market avenues. Instead of employing the method commonly used in Grand Rapids, of assessing the property on each side of the improvement an equal amount per front foot and using an equal depth on each side so as to make rear lots pay for their indirect benefit, a perfectly just and reasonable method, the assessment for this paving was made on a square foot basis.

"On the north side of the street the assessors multiplied the frontage by 247.53 feet (because, forsooth, that was the depth of the Gingrich property) to obtain the area to be taxed; while on the south side, they multiplied the frontage by a depth of 130 feet, with the result that the north frontage is made to pay approximately $13.32 per running foot, while the south frontage pays about $6.66 per running foot. Plaintiffs' paving assessment was $6,350.40 while the total of the properties directly across the street was $3,119.60. In other words, plaintiffs, on the north side of the pavement, are asked to pay more than twice as much as the owners of an equal frontage on the south side. Is this an assessment according to the benefits? It apparently is the theory of the assessors that the owners on the north received more benefit than those on the south. But, before plaintiffs leveled the hill, they were in the same situation as the owners on the south side of the street now are. Are they to be penalized because they at great expense excavated their land so as to make the street available to their use? Furthermore, it is undisputed in this case that the owners on the south could have made their property equally available to the street and equally benefited, by a similar excavation of the hill. Because they have not done so should not operate to relieve them of an equal share of the assessment. It is not the present use of property which determines the benefit it receives from a street improvement; it is, rather, its

available use. Benefits are not to be measured by present actual uses but by potential uses.

"The cost of the opening and widening and of the grading and retaining wall was spread over four separate districts. The first, which was to pay 40 per cent. of the entire tax at a uniform rate per square foot, embraced all the land between Ellsworth and Market on the north side of Cherry street to a depth of 247.53 feet, thus including all of the plaintiff Gingrich company's property and so much of the plaintiff warehouse company's as lies south of Gingrich north line extended westerly. Going across to the east side of Ellsworth avenue, the 40 per cent. district also included the property of the Star Transfer Company at the northeast corner of Cherry (in front of which the street was also widened), but here the area to be assessed was obtained by multiplying the frontage on Cherry by a depth of 92 feet, not by 247.53 feet, as was done with the property of plaintiffs. It may well be asked, why the distinction? This district then jumps across to the southeast corner, where the frontage on Cherry is multiplied by a depth of 55 feet, to obtain the area to be assessed. Then, crossing Ellsworth to the west, the southwest corner of Cherry, owned by A. Van Eerden, is included in the district with an area obtained by multiplying the frontage on Cherry by a depth of 55 feet. Going west, the frontage on the south side of Cherry is entirely excluded from the 40 per cent. district, and is included in a much larger district bearing 15 per cent. of the entire assessment, until the lot at the southeast corner of Cherry and Finney avenue is reached, where this single lot is included as a part of the 40 per cent. district, its frontage on Cherry being multiplied by a depth of 130 feet to obtain the area to be assessed. The exclusion of the lots on the south side of Cherry from the 40 per cent. district is again based on the erroneous assumption that they were not benefited

in the same degree as the property to the north of Cherry, and that at each end of the block on the south side.

"This 15 per cent. district includes, in addition to the lots abutting the south side of the opening, a strip of land on each side of Market and Ellsworth avenues north of Fulton street and south to Wealthy street and on each side of Cherry east to the alley west of Division avenue; with the exception of the city market property, which fronts on and is directly west of the opening, and which is made a district by itself bearing 30 per cent. of the assessment.

"The fourth district, another 15 per cent. district, includes all the property not in any of the other three districts, bounded by Fulton street on the north, the alley just west of Division avenue on the east, Wealthy street on the south, and the Grand River on the west; a large section of the city.

"This unusual scheme of levying assessments has accomplished some rather strange results, a few of which may be cited as examples:

"For the opening, the two plaintiffs have been assessed a total of $5,640.40, while the owners of an equal amount of frontage directly opposite them have been assessed a total of $681.70, less than one-eighth as much.

"For the grading, plaintiffs together pay $8,552.40; their neighbors opposite, $1,028.40, again less than one-eighth as much. In this connection, assuming for the sake of argument that there was a difference in benefits to the property on the north side of the opening from that on the south side, the assessors, in levying the paving tax, required the north side to pay twice as much as the south side of the street. Why, then, with that ratio of difference established, should they assess the north side more than eight times as much as the south side for the opening and grading?

"A piece of land with 100 feet frontage on the opening, owned by one D. Moses, pays for the opening, $30.80, while the 100 feet opposite, owned by the plaintiffs, pays $1,919, over 62 times as much. Taking the two lots of equal frontage and depth on the south side of the street at the west end of the opening, the one further west pays for the opening $334.40, and for the grading, $504.50, while the adjacent lot to the east pays respectively $15.40 and $23.20.

"Plaintiffs pay 6.32 times as much per square foot as the city market property, although the latter, abutting as it does the western extremity of this improvement, receives as much benefit therefrom as can any of the surrounding property.

"Plaintiffs pay about 55.9 times as much per square foot as property on Ellsworth avenue south of Cherry street and as near to the opening as is the north part of plaintiffs' property.

"Plaintiff Gingrich company sold to the city the land necessary for the opening, for $4,733.40, and in turn is assessed $2,927.90 to help pay for it, so that for its land the company nets $1,805.50. Does not this nearly amount to a confiscation of its property?

"As regards the large 15 per cent. district, bounded by Fulton, the alley west of Division, Wealthy and the river, how can it be said that the property just inside of any of these boundaries is benefited by the improvement and therefore should be taxed, while the property directly across from the boundary is not benefited and therefore should be exempted? It is merely an arbitrary assumption. If a district of this size can be assessed on the theory of benefits, it may well be asked why the district cannot be stretched to include the city at large. The city charter, in fact, requires the city commission in each case to fix the amount, if any, of the cost of each special improvement 'which shall be levied upon the city at large.' It is very likely that openings of this character should be paid for in part by

levying upon the city at large, on the theory that they do benefit all property in the city. The opening and widening of main thoroughfares has become of such importance that the State recognizes them of Statewide benefit by using a part of State automobile tax money to assist in paying for them.

"Almost every special improvement tax results in some injustice, but the scheme of assessment used in this case is so lacking in uniformity and equality, so far removed from any plan of a levy according to benefits, that it cannot be sustained. That does not mean that plaintiffs should be relieved from paying their just share of this assessment; it does mean that the present assessment requires them to pay more than their just share and has not been levied according to benefits. The cost of the entire improvement should be reassessed. Plaintiffs may therefore draw a decree restraining the collection of the assessment made."

The decrees are affirmed, with costs to appellees.

CLARK, C. J., and McDONALD, POTTER, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.